EXHIBIT A

 **Starr Surplus Lines Insurance Company**

Starr Surplus Lines Insurance Company
399 Park Avenue, 8th Floor
New York, New York 10022

# STARR RESPONSE<sup>SM</sup>
## Product Contamination Insurance

SL CPI Policy (09/09)

Copyright © C. V. *Starr & Company* and Starr Surplus Lines Insurance Company. All rights reserved

# Starr Surplus Lines Insurance Company

## Declaration Page to the Policy

**Policy No:**     SLSLCRM82025511

**Renewal Of:**     10XC44264701

**Insured:**     **TRI-UNION SEAFOOD**

**Address:**     **9330 Scranton Road, Suite 500, San Diego, CA 92121**

**Period of Insurance:**

From:    11/15/11  To:   11/15/12
Both days at 12.01 am Local Standard Time at the Insured's address as above stated.

**Limits of Liability:**

Section 1.1 - Accidental Contamination
USD $ 3,000,000       Each Insured Event and in the aggregate for the **Policy Period**

Section 1.2 – Governmental Recall
USD $ 3,000,000       Each Insured Event and in the aggregate for the **Policy Period**

Section 1.3 - Malicious Product Tampering
USD $ 3,000,000       Each Insured Event and in the aggregate for the **Policy Period**

Section 1.4 – Insured Products Extortion:
USD $ 3,000,000       Each Insured Event and in the aggregate for the **Policy Period**

Policy Aggregate Limit
USD $ 3,000,000       Each Insured Event and in the aggregate for the **Policy Period**

**Sub-Limits:**

| | |
|---|---|
| Rehabilitation Expenses: | 25% Sub-Limit Each Insured Event and in the aggregate during the period of insurance being part of the Accidental Contamination or Malicious Product Tampering limit of liability per Insured Event |
| Crisis Consultants' Costs: | Unlimited |
| Pre-incident Crisis Consultant Costs | 5 Consultant Days |
| Third Party Recall costs as per 3.18 (vi) | No Sublimit Applies each Insured Event and in the aggregate. This sub-limit does not increase the limit of liability per Insured Event. |

SL CPI Policy (09/09)
Copyright © C. V. Starr & Company and Starr Surplus Lines Insurance Company. All rights reserved

## Starr Surplus Lines Insurance Company

**Self-Insured Retention:**

| | |
|---|---|
| Section 1.1 | USD$ 250,000 per Insured Event |
| Section 1.2 | USD$ 250,000 per Insured Event |
| Section 1.3 | USD$ 250,000 per Insured Event |
| Section 1.4 | NIL |

No Self-Insured Retention applies to any Consultants' Cost

**Premium:**     REDACTED

**Policy Territory:**     World-wide

**Specified Insured Product(s):**     All topical and ingestible products manufactured and distributed by the Insured based on sales of $ 540 m.

**Endorsements Effective this Policy:**
Customer Loss of Gross Profit – SI CPI – 005 (11/09)
Service of Suit - SL 704 CA (08-10)

**Period of Indemnity:** 1 YEAR

**Law and Jurisdiction of the Policy:**

Law:  The Supreme Court of The State of New York     Jurisdiction:  New York State

[Honora Keane], General Counsel

[Charles H. Dangelo], President

SL CPI Policy (09/09)
Copyright © C. V. Starr & Company and Starr Surplus Lines Insurance Company.  All rights reserved



# Starr Surplus Lines Insurance Company
# Product Contamination Insurance

In consideration of the premium paid and in reliance on the warranties and representations made by the **Insured** in the Application for this insurance, its attachments and all underwriting information submitted which is incorporated into and forms a part of this insurance, the Insurers agree as follows:

## 1.   Insured Events

The Insurer will reimburse the **Insured** for its **Loss** excess of the applicable Self-Insured Retention, but not exceeding the limits of liability stated on the Declaration Page, caused by or resulting from any of the following **Insured Events** first discovered during the **Policy Period** and reported to the Insurers in writing in accordance with Condition 5.22 Notice of Loss, during the **Policy Period** or up to thirty (30) days after non-renewal of the Policy, provided that as of inception of this insurance the **Insured** were not aware and could not reasonably have been aware of circumstances which could produce **Loss** under this Policy.

### 1.1   Accidental Contamination

Any accidental or unintentional contamination, impairment or mislabeling of an **Insured Product(s)**, which occurs during or as a result of its production, preparation, processing, manufacture, labeling (including instructions for use), processing, packaging, mixing, blending, compounding or distribution, or **Adverse Publicity** implying such; provided that the use or consumption of such **Insured Product(s)**:

(i)   has resulted in or would result in clear, identifiable, internal or external visible physical symptoms of **Bodily Injury** within three hundred and sixty five days (365) days following such consumption or use or

(ii)   has caused or would cause **Property Damage** other than damage to or destruction of **Insured Product(s)**.

### 1.2   Governmental Recall

Any accidental or unintentional contamination, impairment or mislabeling of an **Insured Product(s)** which occurs during or as a result of its production, preparation, processing, manufacture, labeling (including instructions for use), processing, packaging, mixing, blending, compounding or distribution that causes the **Insured Product(s)** to be   injurious to health or unfit for human consumption and as a result:

(i)   an official recall order has been issued by the competent authorities; or

(ii)   a recall order by the competent authority is imminent

in order to comply with regulations on food safety.

### 1.3   Malicious Product Tampering

Any actual or threatened intentional, **Malicious** and wrongful alteration or contamination of the **Insured's Product(s )** or **Adverse Publicity** implying such, by anyone including an employee of the **Insured**, which both:

(i)   specifically targets the **Insured** with the exclusive and deliberate purpose of:

(a)   causing harm to the reputation or finances of the **Insured**; or

SL CPI Policy (09/09)
Copyright © C. V. Starr & Company and Starr Surplus Lines Insurance Company.  All rights reserved

 **Starr Surplus Lines Insurance Company**

    (b)    causing injury to or damage to property of any customer or employee of the **Insured**; and

    (ii)    renders the **Insured Product(s)** unfit or dangerous for its intended use or consumption or creates such impression to the public.

**1.4    Insured Product Extortion**

Any threat or connected series of threats to commit Malicious Product Tampering, as set forth in 1.3 above, communicated to the **Insured**, for the purpose of demanding **Ransom Monies**.

## 2.   Loss

**Loss** under this Policy includes only the following reasonable and necessary expenses or costs listed below that are incurred by the **Insured** directly and solely in connection with a covered **Insured Event** and subject to the Limits of Liability stated on the Declaration Page.

2.1    **Crisis Consultant Costs**
2.2    **Pre-incident Consultant Costs**
2.3    **Business Interruption Expense**
2.4    **Destruction Costs**
2.5    **Insured Product Extortion Costs**
2.6    **Pre-Recall Expenses**
2.7    **Recall Costs**
2.8    **Redistribution Costs**
2.9    **Rehabilitation Expenses**
2.10  **Replacement Costs**

Except as otherwise provided with respect to **Business Interruption Expense** and **Extortion Costs, Loss** is limited to expenses and costs incurred within twelve (12) months of when the **Insured Event** first became known to the **Insured**. In no event will any amounts claimed and paid under one **Insured Event** be recoverable under another **Insured Event**.

Copyright © C. V. Starr & Company and Starr Surplus Lines Insurance Company. All rights reserved

 **Starr Surplus Lines Insurance Company**

## 3. Definitions

3.1 **Adverse Publicity** means the reporting of an actual or alleged Accidental Contamination or Malicious Product Tampering specifically naming the **Insured Product**, during the **Policy Period** in local, regional or national media (including but not limited to radio, television, newspaper, magazines or the Internet); or a publication released by the government of any country where the **Insured Product** is sold or distributed.

3.2 **Bodily Injury** means

    (i)    death; or

    (ii)   clear, identifiable, internal or external visible physical symptoms of injury, sickness or disease sustained by a person.

    **Bodily Injury** does not include emotional distress or mental anguish unless due to physical injury, sickness or disease.

3.3 **Business Interruption Expense** means the sum of the **Loss of Gross Revenue** during the Period of Indemnity and **Extra Expense**.

3.4 **Crisis Consultant Costs** means fees and costs of any of independent food-safety, public relations, security or similar consultants hired with the Insurer's prior written consent to directly assist the **Insured** in responding to an **Insured Event**. No prior written consent will be required for consultants that have been pre-approved by the Insurer.

3.5 **Destruction Costs** means expense incurred by the **Insured**, or by the **Insured**'s distributor on behalf of the **Insured**, to properly destroy or dispose of unused packaging and point of purchase marketing material of recalled **Insured Product(s)** as a result of an **Insured Event**.

3.6 **Extra Expense** means the excess of the total expense of conducting business activities during the period of time necessary to clean or repair the location owned or operated by the **Insured** where the **Insured Event** occurred for the sole purpose of reducing **Loss**. This Policy only covers those **Extra Expenses** which are over and above the cost of such activities during the same period of time had no **Insured Event** occurred. Such **Extra Expense** may include:

    (i)    the direct expense of cleaning the machinery or location involved in the contamination or handling of the contaminated product in order to recreate an environment in which safe products can be manufactured or handled;

    (ii)   the direct expense required in maintaining the salaries of the workforce to the extent required by statute, union or other work contract for a maximum period of six (6) months; the expense to maintain a minimum work force at a minimal percentage of salary in order to be able to open the plant without delay as soon as possible after a shutdown imposed by the Health and Safety Executive or other national or local governmental organization or body having jurisdiction over health and safety in the workplace or of products;

Copyright © C. V. Starr & Company and Starr Surplus Lines Insurance Company. All rights reserved

 **Starr Surplus Lines Insurance Company**

    (iii)    the increased expense of subcontracting some or all of the manufacturing process to a contract manufacturer for a period of time necessary to restore the **Insured**'s facilities to a state in which products can be manufactured or handled safely.

3.7    **Insured** means the sole proprietorship, partnership or corporation listed on the Declaration Page.

3.8    **Insured Event** means any Accidental Contamination, Governmental Recall, Malicious Product Tampering or Insured Products Extortion.

3.9    **Insured Product(s)** means

    (i)    all topical and ingestible products for human use or consumption, including any of their ingredients, packaging or components, that have been reported to the Insurer in the Application or by addendum to the application on file with the Insurer for the effective dates of this Policy and that are:

        a.    in production by the **Insured**; or
        b.    have been manufactured, handled or distributed by the **Insured**; or
        c.    manufactured by any contract manufacturer for the **Insured**; or
        d.    are being prepared by the **Insured** for or are available for sale;

    (ii)    any product(s) which are first introduced or newly developed by the **Insured** after the inception date of the policy provided that:

        a.    written notice is given to the Insurer no less than sixty (60) days prior to the introduction for sale; and
        b.    the **Insured** did not know nor could reasonably have been expected to know as of the date of the written notice to the Insurer that an **Insured Event** affecting the new product(s) had occurred; and
        c.    the Insurer has given written acceptance of such new product(s). Such acceptance will not be unreasonably withheld and will be given within thirty (30) days of written receipt of the request to cover the new product. Notwithstanding, at the sole discretion of the Insurer, such acceptance by the Insurer may be contingent upon changes in one or more of the terms, conditions or premium of the Policy.

    Variations of existing products and/or new blends are not classed as a newly developed product and are automatically covered.

Copyright © C. V. Starr & Company and Starr Surplus Lines Insurance Company. All rights reserved

 **Starr Surplus Lines Insurance Company**

3.10   **Insured Product Extortion Costs** means costs including the following, paid by the **Insured** in direct response to a **Insured Product Extortion** demand first made upon the **Insured** during the **Policy Period** and paid under threat to commit a Malicious Product Tampering:

(i)   **Ransom Monies**;

(ii)   In transit loss of **Ransom Monies** due to the destruction, disappearance, confiscation or wrongful appropriation of **Ransom Monies** while being handled or conveyed by anyone who is authorized by the **Insured** to have custody thereof; provided, however, that the **Insured Product Extortion** which gave rise to the delivery is covered hereunder;

(iii)   Money paid by the **Insured** to anyone, other than an **Insured**, providing information not otherwise available in response to an **Insured Product Extortion**;

(iv)   Interest costs for a loan from a financial institution made to the **Insured** for the purpose paying an Insured Product Extortion demand;

(v)   Costs of travel and accommodations incurred by or on behalf of the **Insured** while attempting to negotiate the resolution of a Insured Product Extortion demand;

(vi)   medical services and hospitalization costs incurred by any person(s) directly involved in the handling or negotiating of a Insured Product Extortion and/or the handling of Ransom Monies and paid by the **Insured** as the direct result of a **Insured** within thirty six (36) months following the last credible extortion threat discovered during the **Policy Period,** including any costs for treatment by a neurologist or psychiatrist, costs for cosmetic surgery and expense of confinement for such treatment;

(vii)   fees and expenses of independent forensic analysts engaged by the **Insured**;

(viii)   fees and expenses of a qualified interpreter assisting the **Insured** in connection with a Insured Product Extortion;

(ix)   Increased security costs due to an Insured Product Extortion demand including but not limited to hiring of security guards, hiring of armored vehicles, and overtime pay to existing security staff for a period of up to 90 days, provided however that the security consultants approved in writing Insurer have specifically recommended such security measures.

3.11   **Loss of Gross Revenue** means:

(i)   the **Insured's** sales revenue as could have been reasonably projected immediately prior to the happening of an **Insured Event,** but which

SL CPI Policy (09/09)

Copyright © C. V. Starr & Company and Starr Surplus Lines Insurance Company.  All rights reserved

8/19

 **Starr Surplus Lines Insurance Company**

has been lost during the Period of Indemnity following the date of an **Insured Event** solely and directly as a result of that **Insured Event**, LESS

(ii)   the variable costs that would have been incurred during the same period, but which have been saved as a result of not making those sales (including the cost of raw materials and all other saved costs), LESS

(iii)   the increased sales, if any, of another **Insured Product(s)** within the same product line as the affected product(s) claimed in the **Loss** as a result of an **Insured Event**.

Any **Loss of Gross Revenue** shall be computed in accordance with Condition 5.28 Computation of **Loss** below.

3.12   **Malicious** means an act committed with the intention to inflict

(i)   **Bodily Injury** or **Property Damage** to any one; and/or

(ii)   economic damage to the **Insured**

with the intention that such act becomes known to the **Insured** or the public at large.

3.13   **Policy Period** means the period from the inception date specified in Declarations to the earlier of the expiration date specified in the Declarations or the effective date of cancellation

3.14   **Pre-Incident Crisis Consulting Costs** means fees and costs incurred by the **Insured** for any of the independent food-safety, public relations, security or similar consultants hired with the Insurer's prior written consent to directly assist the **Insured** in mitigation of an **Insured Event**.

3.15   **Pre-Recall Expenses** means fees and costs incurred by the **Insured** for chemical analysis and/or physical examination in order to ascertain whether the **Insured Product(s)** has been contaminated and/or to ascertain the potential effect of Malicious Product Tampering, Accidental Contamination or Insured Product Extortion.

3.16   **Property Damage** means physical damage to, loss of, or destruction of tangible property.

3.17   **Ransom Monies** means cash, monetary instruments, bullion, or the fair market value of any securities, tangible personal property or services paid or provided by the **Insured** as a direct result of a **Insured Product** Extortion demand.

Copyright © C. V. Starr & Company and Starr Surplus Lines Insurance Company. All rights reserved

 **Starr Surplus Lines Insurance Company**

3.18 **Recall Costs** means costs incurred by the **Insured**, or by the **Insured's** distributor, to inspect and withdraw such affected **Insured Product(s)** directly and solely as a result of an **Insured Event**. Recall Costs also include:

    (i) the costs of newspaper, magazine or any printed advertising (electronic or otherwise), radio and television announcements or commercials, as well as costs of correspondence, necessary to effect the recall of the **Insured Product(s)**;

    (ii) essential transportation and accommodation costs directly attributable to the recall of the **Insured Product(s)**;

    (iii) the costs of hiring additional people, other than regular employees of the **Insured**, devoted exclusively to the effect of the recall of the **Insured Product(s)** and/or overtime paid to regular employees of the **Insured** for work devoted exclusively to the recall of **Insured Product(s)**;

    (iv) expense of rending or hiring additional warehouse or storage space for the recall of the **Insured Product(s)** for a maximum of twelve (12) months);

    (v) retail slotting fees and cancellation fees for any advertising and/or promotion programs, which were scheduled but were cancelled solely because of an **Insured Event**;

    (vi) In the event that the **Insured Product(s)** are produced on behalf of a customer specifically for resale under the customer's own brand or become an ingredient or component part in a product manufactured, distributed or handled by a customer of the **Insured**, coverage shall apply to Recall Costs listed above for such products only to the extent that the **Insured** reimbursed the customer for such recall costs. The amount the Insurer will pay the **Insured** for a customer's expenses as described above shall not exceed the Limits of Liability or the amount the **Insured** would have incurred in recalling the aforementioned customer's products.

3.19 **Redistribution Costs** means the actual direct costs incurred by the **Insured** for the redistribution of any **Insured Product(s)** or replaced **Insured Product(s)** as a result of an **Insured Event**.

3.20 **Rehabilitation Expenses** means the expenses actually incurred directly by the **Insured** as a direct result of an **Insured Event** to re-establish the **Insured's Product(s)** to the reasonably projected level of sales or market share anticipated prior to the **Insured Event**.

The Limit of Liability provided for **Rehabilitation Expenses** is sub-limited to 25% of the Limit of Liability associated with the applicable **Insured Event**.

3.21 **Replacement Costs** means the costs incurred directly by the **Insured** to restore any affected **Insured Product(s)** to merchantable quality or to replace any affected **Insured Product(s)**, which have been destroyed as a

SL CPI Policy (09/09)

Copyright © C. V. Starr & Company and Starr Surplus Lines Insurance Company. All rights reserved

 **Starr Surplus Lines Insurance Company**

result of an **Insured Event** or are unfit for sale or for their original use as a result of an **Insured Event**, with product(s) of similar value.

3.22 **Terrorism** means an act of actual, alleged or threatened, intentional, **Malicious** and wrongful alteration or contamination of any product(s), not limited to **Insured Product(s)**, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organization(s) or government(s), committed for political, religious, ideological or similar purposes, including the intention to influence any government and/or to put the public or any section of the public in fear.

## 4.  Exclusions

This Policy does not apply to any **Loss** arising out of, based upon, attributable to or involving, directly or indirectly any:

4.1  product of a competitor which is similar to an **Insured Product(s)**;

4.2  deterioration, decomposition or transformation of an **Insured Product(s)** unless such deterioration, decomposition or transformation is a direct result of an **Insured Event**;

4.3  changes in:

    (i)  governmental regulations or public perceptions with respect to the safety of any **Insured Product(s)** or intended ingredients;

    (ii)  customer tastes, economic conditions, seasonal sales variations or competitive environment;

4.4  deliberate act, including any dishonest, willful, illegal, fraudulent, criminal or **Malicious** act committed by the **Insured's** directors, officers or trustees.

4.5  injury, damage or claim made by a third party arising out of or in connection with the use or consumption of the **Insured Product(s)**, including, but not limited to, defense costs related to a third party lawsuit;

4.6  intentional violation by the **Insured**, or the **Insured's** distributor, of any governmental regulation or industry best practice in connection with the manufacture, testing, sale, storage or distribution of any **Insured Product(s)** or from the use of materials, ingredients or substances in the manufacturing process of any **Insured Product(s)** which have been banned or declared unsafe by any governmental entity;

4.7  nuclear reaction or nuclear radiation or radioactive contamination (except a radioactive tampering specifically aimed at the **Insured Product(s)**), all whether controlled or uncontrolled or resulting from any act or condition incident to any of the foregoing;

4.8  war, invasion, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection or military or usurped power;

4.9  circumstance(s) or matter(s):

    (i)  which an officer or director of the **Insured** had actual or constructive knowledge prior to the policy inception date; or

SL CP1 Policy (09/09)

Copyright © C. V. Starr & Company and Starr Surplus Lines Insurance Company. All rights reserved

 **Starr Surplus Lines Insurance Company**

    (ii)   that take place on or after the **Insured**, employee, officer or director of the **Insured** has actual or constructive knowledge of a defect or deviation in the production, preparation or manufacture of **Insured Product(s)**; or

    (iii)   has or is  reasonably likely to result in such defect or deviation in the production, preparation or manufacture of **Insured Product(s)**, and the **Insured** has failed to take reasonable corrective action;

4.10 **Loss** or diminution in value of land (including land on which property is located), soil, water, growing crops or lawns, crop failure due to weather, pest or other cause or contamination of livestock

4.11 costs associated with the expense to design or redesign, engineer or re-engineer any product or **Insured Product(s)**;

4.12 recall of an **Insured Product** initiated due to:

    (i)   the failure of an **Insured Product** to accomplish its intended purpose, including any breach of warranty of fitness, whether written or implied; or

    (ii)   the expiration of the designated shelf life of the **Insured Product**;

4.13 fines or penalties imposed by law; or punitive, aggravated, contractual penalties or exemplary damages;

4.14 matters that may be deemed uninsurable under the law pursuant to the which this policy is construed.

4.15 actual or alleged act of Terrorism except where the **Insured** or an **Insured Product** is the direct target of the act or alleged act of Terrorism;

4.16 Accidental Contamination or Governmental Recall arising out of:

    a)   bioengineering, genetic engineering or genetic modification of any **Insured Product(s)**; or

    b)   hormone treatment of any **Insured Product(s)**; or

    c)   irradiation of any **Insured Product(s)**; or

    d)   Transmissible Spongiform Encephalopathies (TSE);

    e)   Carcinogens

Copyright © C. V. Starr & Company and Starr Surplus Lines Insurance Company.  All rights reserved

 **Starr Surplus Lines Insurance Company**

## 5. Conditions

### 5.1 Representation

In granting cover to the **Insured**, the Insurer has relied upon material statements and particulars in the Application for this Policy together with its attachments and other information supplied. These statements, attachments and information are the basis of the coverage afforded under this Policy and are incorporated into and constitute a part of this Policy.

### 5.2 Action against the Insurers

No suit, action or proceedings for recovery of any **Loss** under this Policy will be sustainable in any court of law, equity or other tribunal unless all the requirements of this policy are complied with and is commenced within twenty four (24) months after a final Statement Of **Loss** has been submitted to the Insurer by the **Insured**.

### 5.3 Additional Exposures

The **Insured** will give the Insurer written notice as soon as practicable of any additional exposure arising from:

(i)     consolidation or merger with; or
(ii)    acquisition of the majority stock ownership of; or
(iii)   acquisition of the assets of or
(iv)    creation of

any other entity whose revenues are in excess of 10% of the gross revenue of the **Insured** as of the date of consolidation, merger, creation or acquisition.

The Insurer in its sole discretion may accept or decline such additional exposure. If the additional exposure is declined, it will remain covered only until the Insurer informs the **Insured** in writing of the declinature. If the Insurer accepts the additional exposure, the **Insured** will pay the Insurer the additional premium as may be required.

No **Loss** arising out of the additional exposure will be covered unless the **Insured**, at the time it gave written notice of the additional exposure to the Insurer, did not know nor could reasonably have been expected to know of the **Insured Event** giving rise to the **Loss**.

### 5.4 Appraisal

If the **Insured** and the Insurer fail to agree as to the amount of **Loss**, each will, on the written demand of either, made within sixty (60) days after the Insurer's rejection of a Statement of Loss submitted by the **Insured,** select a competent and disinterested appraiser in New York. The appraisers will appraise the **Loss** stating the amount of **Loss**. If the appraisers fail to agree they will select a competent and disinterested umpire, and failing for fifteen (15) days to agree upon an umpire, then, on the request of the **Insured** or the Insurer, such umpire will be selected by a judge of any competent court in the United States, and the appraisers will submit their differences to the umpire. An award in writing of any two will determine the amount of **Loss**. The **Insured** and the Insurer will each pay its chosen appraiser and will bear equally the other expenses of the appraisal and umpire. The Insurer will not be held to have waived any of its rights by any act relating to appraisal.

Copyright © C. V. Starr & Company and Starr Surplus Lines Insurance Company.  All rights reserved

 **Starr Surplus Lines Insurance Company**

**5.5**   **Assistance and Co-Operation**

The **Insured** will cooperate with the Insurer in all matters relating to this Policy, including but not limited to, attending hearings and trials, securing and giving evidence, obtaining the attendance of witnesses, assisting in effecting settlements and in conducting litigation, arbitration or other proceedings.

**5.6**   **Authorization Clause**

By acceptance of this Policy, the first **Insured** listed on the Declaration Page agrees to act on behalf of all other **Insureds** with respect to the exercise of all their rights and the discharge of all of their duties in respect of this Policy, including but not limited to, the giving and receiving of any return premiums that may become due under this Policy, the acceptance of endorsements and the giving or receiving of any other notice including claims and **Losses**.

**5.7**   **Calculation of the Amount Payable under a Sub-Limit**

Any amount payable for **Loss** under any Sub-limit of this Policy will be calculated as follows:

First the apportioned Self-Insured Retention as calculated under Condition 5.14 will be subtracted from the **Loss**. Second, the applicable coinsurance will be deducted from the balance. The amount payable will be the lesser of either the Sub-limit or the amount remaining. No amount of **Loss** will be paid in excess of the Sub-limit.

**5.8**   **Cancellation**

This Policy may be cancelled by the **Insured** by the surrender of this Policy to the Insurer or by giving at least ten (10) days advance written notice to the Insurer, stating when thereafter such cancellation will be effective. This Policy may be cancelled by the Insurer by delivering to the **Insured** or by mailing to the **Insured** by registered or certified mail, at the **Insured's** address stated on the Declaration Page, written notice stating when, not less than one hundred and twenty (120) days thereafter, the cancellation will be effective, except in the case of cancellation for non-payment of premium by the **Insured**, in which case the Insurers will provide at least ten (10) days written notice. The mailing of such notice will be sufficient proof of notice and this Policy will terminate at the date and hour specified in such notice.

If this Policy is cancelled by the **Insured**, the Insurer will retain the short rate portion of the premium hereon provided no **Loss(es)** have been previously reported to the Insurer during the relevant **Policy Period** and prior to the date of cancellation. Notwithstanding, no refund of premium will be made to the **Insured** in the event **Loss(es)** have been previously reported to the Insurer during the relevant **Policy Period** and prior to the date of cancellation.

If this policy is cancelled by the Insurer, the Insurer will retain the pro-rata portion of the premium hereon. Payment or tender of any unearned premium by the Insurer will not be a condition precedent to the effectiveness of cancellation, but such payment will be made as soon as practicable.

**5.9**   **Changes**

Notice to any authorized representative of the Insurer or knowledge possessed by any representative or by any person will not effect a waiver or a change in any part of the Policy or estop the Insurer from asserting any right under the terms of this Policy, nor can the terms of this Policy be waived or changed unless agreed to in writing by Insurer or an authorized representative of the Insurer.

Copyright © C. V. Starr & Company and Starr Surplus Lines Insurance Company.  All rights reserved

 **Starr Surplus Lines Insurance Company**

**5.10   Choice of Law and Forum**

The construction, validity and performance of this Policy will be governed by the laws of the State of New York. The Insurer and the **Insured** hereby expressly agree that all claims and disputes will be litigated in the Supreme Court of the State of New York in and for the County of New York or in the U.S. District Court for the Southern District of New York.

**5.11   Coinsurance**

The **Insured** is responsible for the Coinsurance amount stated on the Declaration Page of each covered **Loss** in excess of and in addition to the Self-Insured Retention. The Coinsurance amount will be calculated by multiplying the covered **Loss** in excess of the Self-Insured Retention by the Coinsurance amount. The Insurer will pay covered **Loss** in excess of the Self-Insured Retention subject to the Limit of Liability stated on the Declarations Page after deduction of the Coinsurance amount from the covered **Loss**.

**5.12   Concealment, Misrepresentation, Non-Disclosure and Fraud**

Without prejudice to the Insurers' other rights, howsoever arising, this Policy is null and void in case of concealment, misrepresentation or non-disclosure by any **Insured**, whether or not fraudulent, of a material fact concerning:

(i)     this Policy or the procurement thereof; or
(ii)    the **Insured Product(s)**, or the **Insured's** interest in the **Insured Product(s)**; or
(iii)   any **Insured Event** or any **Loss** or claim under this Policy.

**5.13   Confidentiality**

The **Insured** will not disclose the existence of this Policy to any person or party whether within or outside the **Insured** except insofar as is required in order to comply with the terms of the Policy or by law.

**5.14   Self-Insured Retention**

The Self-Insured Retention stated on the Declaration Page will apply separately to each and every **Loss**. The Self-Insured Retention is to be borne by the **Insured** and remain uninsured.

**5.15   Due Diligence**

The **Insured** will exercise due diligence to do all things reasonable and practical to avoid any happening or circumstances covered by this Policy and to make all reasonable efforts to mitigate any **Loss** arising as a result of an **Insured Event**.

**5.16   Examination under Oath**

The **Insured**, as often as may be reasonably required, shall produce to any person designated by the Insurer all affected **Insured Product(s)** whether salvageable or otherwise, and shall submit to examinations under oath by any person named by the Insurer, and subscribe the same; and, as often as may reasonably be required, shall produce for examination all books of account, vouchers, bills, invoices, schedules, accounting information and any documentation relating to the **Insured's** calculation of its **Loss**, or certified copies thereof if originals be lost, at such reasonable time and place as may be designated by the Insurer or their representative, and shall permit extracts and copies thereof to be made.

SL CPI Policy (09/09)
Copyright © C. V. Starr & Company and Starr Surplus Lines Insurance Company.  All rights reserved

 **Starr Surplus Lines Insurance Company**

**5.17 Excess Insurance**

The **Insured** may purchase other insurance over the Limit of Liability set forth in this Policy without prejudice to this Policy, provided that the Insurer are notified in writing of the details of such other excess insurance at the time such other insurance is acquired. The existence of such other insurance, if any, will not reduce the Insurers' liability under this Policy.

**5.18 Inspection and Audit**

The Insurer may examine and audit the **Insured's** business documents relating to the subject matter of this Policy until three (3) years after this Policy has expired or has been cancelled. Any premium due for exposures which exist but were not reported will be determined through audit by the Insurer.

**5.19 Limits of Liability**

The Insurers' liability under this Policy will be limited to the amounts stated on the Declaration Page. The Policy Aggregate Limit is the total aggregate limit of the Insurer's liability for all **Losses** of all **Insureds** under this Policy combined discovered and reported during the **Policy Period** in accordance with the terms herein. Additionally, **Losses** reported, up to thirty (30) days after the expiration of this Policy will also be considered reported during the **Policy Period** and will also be subject to the aggregate Limit of Liability. All expenses and costs, except for **Crisis Consultant Costs**, are part of **Loss** and subject to the total aggregate Limit of Liability for **Loss**.

**5.20 Non-Accumulation of Liability**

Regardless of the number of years this Policy may continue in force, and of the number of premiums which may be payable or paid, or of any other circumstances whatsoever, the aggregate liability of the Insurer under this Policy with respect to any **Insured Event(s)** will not be cumulative from year to year or period to period. When there is more than one **Insured**, the aggregate Limit of Liability of the Insurers for **Loss(es)** sustained by any or all **Insureds** will not exceed the amount for which the Insurer would be liable if all **Loss(es)** were sustained by any one **Insured**.

**5.21 Non-Assignment**

This Policy and any rights hereunder can not be assigned or transferred without the written consent of the Insurer.

**5.22 NOTICE OF LOSS:**

In the event of an incident that may be covered under the terms of this Policy, the **insured** will as a condition precedent to the obligations of the Insurer under this Policy:

(i.) Inform the Insurer as soon as practicable; and

(ii.) having given notice under (a), determine whether an **Insured Event** has actually occurred; and

(iii.) upon determination that an **Insured Event** has actually occurred under (c), provide written notice to the Insurer within 5 days or as soon as is practicable, whichever is earlier, of becoming aware of an **Insured Event**; and

(iv.) comply with Condition 8., Statement of Loss; and

Copyright © C. V. Starr & Company and Starr Surplus Lines Insurance Company. All rights reserved

 **Starr Surplus Lines Insurance Company**

(v.)  in addition, the **insured** must provide the Insurer with periodic and timely updates concurrent with activity occurring during the **Insured Event**.

All notifications must be in writing and properly addressed to the Insurer at the following address:

**Starr Adjustment Services, Inc.**
**3353 Peachtree Road, NE, Suite 1000**
**Atlanta, GA 30326**

**Claims Fax:**      (404) 946-1497
**Claims Phone:**  (404) 946-1400

**5.23  Notices**

Except as indicated to the contrary herein, all notices, applications, demands or requests provided for in this Policy will be in writing and will be given to or made upon either party at its address shown on the Declaration Page.

**5.24  Other Insurance**

The **Insured** may purchase other insurance written on the same terms and conditions as this Policy provided the Self-insured Retention and Coinsurance remains uninsured. The insurance provided under this Policy will be primary in all instances except where a Kidnap and Ransom or Extortion policy exists, in which case this Policy will co-insure all **Losses** where coverage is also provided by such Kidnap and Ransom/Extortion policy.

**5.25  Salvage**

Any salvage or other recovery, after expenses incurred in salvage or recovery is deducted, will accrue entirely to the benefit of the Insurer until the sum paid by the Insurer has been recovered. In case of damage to property bearing a brand or trademark, or which in any way carries or implies the guarantee or the responsibility of the **Insured**, the salvage value of such damaged property will be determined after removal in the customary manner of all such brands or trademarks or other identifying characteristics, the costs of which will be borne by the **Insured**.

The goodwill and public image of the **Insured** will be considered in determining whether any **Insured Product(s)** should be involved in salvage recovery. The Insurer's right to salvage will not be restricted by the **Insured**. The **Insured** will have full right to the possession of all goods involved in any **Loss** under this Policy and will retain control of all damaged goods. There can be no abandonment of any property to the Insurer.

**5.26  Severability, Construction and Conformance to Statute**

(i)  If any provision contained in this Policy is, for any reason, held to be invalid, illegal or unenforceable in any respect, it is deemed to be severed and to have no effect on any other valid legal and enforceable provision of this Policy.

SL CPI Policy (09/09)
Copyright © C. V. Starr & Company and Starr Surplus Lines Insurance Company. All rights reserved

 **Starr Surplus Lines Insurance Company**

(ii) If any provision contained in this Policy can be construed as being invalid, illegal or unenforceable for any reason, it will be construed by limiting it so as to be valid, legal and enforceable to the extent compatible with applicable law.

(iii) Any provisions of this Policy which are in conflict with the statutes or regulations of the state wherein this Policy is issued are hereby amended to conform to such statutes or regulations.

### 5.27  Territory

This Policy applies to an **Insured Event** anywhere in the world unless specifically limited by the Insurer through endorsement or where the **Insured** or any beneficiary under this Policy is a citizen or instrumentality of the government or, any country(ies) against which any laws and/or regulations governing this Policy and/or the Insurer, have established any embargo or other form of economic sanction which have the effect of prohibiting the Insurer to provide insurance coverage, transacting business with or otherwise offering economic benefits to the **Insured** or any other beneficiary under this Policy. No benefits or payments will be made to any beneficiary(ies) who is/are declared unable to receive economic benefits under the laws and/or regulations governing this Policy and/or the Insurer.

### 5.28  Computation of Loss

(i) In the event of any **Loss**, detailed claims for payment by the Insurers shall be made by the **Insured** as soon as practicable and shall be accompanied by a computation of **Loss**, which sets out in detail how the **Loss** has been calculated and what assumptions have been made. The **Insured** shall produce any documentary evidence, books of account, bills, invoices and other vouchers and copies of the same which Insurers or their representatives, including forensic accountants, may require and the **Insured** shall afford them every assistance in their investigations including reasonable access to the **Insured** premises, personnel and necessary documents for the purpose of the computation of **Loss**.

(ii) The Insurers shall determine the amount of any **Loss**, taking into account any savings or recoveries or offsetting or make-up of **Losses** which have been made or which the **Insured** could reasonably have been expected to make and the ability of the **Insured** to resume operations.

(iii) **Loss of Gross Revenue** shall be assessed by the Insurers based on an analysis of the profits generated by the affected **Insured Products** and other **Insured Products** which lost sales as a direct result of the **Insured Event**, during each month of the twelve months prior to the **Insured Event** and taking into account:-

    a. the future profitability of such product(s) had no **Insured Event** occurred and

    b. all material changes in market conditions of any nature whatsoever which would have affected the future marketing of and profits generated by the **Insured Products** or other affected **Insured Products**.

(iv) In determining the amount of any **Loss**, Insurer shall apply standard accounting principles as recognized by the relevant regulatory authorities in the **Insured's** jurisdiction. Where an **Insured** is present in more than one jurisdiction the relevant principles to be applied will

SL CPI Policy (09/09)

Copyright © C. V. Starr & Company and Starr Surplus Lines Insurance Company. All rights reserved

 **Starr Surplus Lines Insurance Company**

be those of the jurisdiction in which the entity that has suffered the **Loss** is based.

(v) Where **Loss** are paid by the Insurers in currency other than the currency in which the premium is paid, the rate of exchange for payment of **Loss** shall be based on the published wholesale exchange rate on the date written notice of the **Insured Event** is received by the Insurers.

(vi) Whether or not any partial payments have been made, a final statement of loss with respect to all items of **Loss** other than **Loss of Gross Revenue** must be submitted to the Insurers in writing no earlier than twelve (12) months and no later than twenty four (24) months after an **Insured Event** first becomes known to the **Insured**. A final Statement of Loss with respect to **Loss of Gross Revenue** must be submitted no later than twenty four (24) months after the beginning of a reduction in sales of the **Insured Product(s)** caused by an **Insured Event**.

Nothing in the clause shall be deemed to override the provisions of the Notice of **Loss** clause.

**5.29  Valuation Clause**

In determining the amount of **Loss of Gross Revenue**, **Extra Expense** and other covered **Loss**, adjustments will be made as may be necessary given the experience of the business before the **Insured Event** and the probable experience thereafter, had the **Insured Event** not occurred. The probable level of sales and experience of the business had the **Loss** not occurred must be demonstrated with reasonable certainty by the **Insured**.

**5.30  Subrogation**

In the event of any payment under the Policy, the Insurer will be subrogated to the extent of such payment to all the **Insured's** rights of recovery. In such case the **Insured** will execute all documents required and will do everything necessary to secure and preserve such rights including the executions of such documents necessary to enable the Insurers effectively to bring suit in the name of the **Insured**

**5.31  Titles and Paragraphs**

Titles and paragraphs are inserted solely for the convenience of reference and will not limit, expand, or otherwise affect the provisions to which they related. Words and expressions in the singular include plural and vice versa. Words **bolded** have special meaning and are defined. Words that are specifically not defined in this Policy have the meaning normally attributed to them.

Copyright © C. V. Starr & Company and Starr Surplus Lines Insurance Company. All rights reserved

# Starr Surplus Lines Insurance Company

Starr Surplus Lines Insurance Company
399 Park Avenue, 8th Floor
New York, New York 10022

Endorsement No.:      001
This endorsement, effective:      11/15/11
(at 12:01 a.m. Standard Time at the address stated in Item 1 of the Declarations)
Forms a part of Policy No.:      SLSLCRM82025511
Issued to: Tri-Union Seafood
By:      Starr Surplus Lines Insurance Company

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### CUSTOMER LOSS OF GROSS PROFIT

This endorsement modifies insurance provided under the following:

It is hereby understood and agreed that:

Section 2, **Loss** is amended to include the following additional Items:

2.11    **Customer Loss of Gross Profit**

Section 3, **Definitions**, is amended to include the following additional definitions:

A.    **Customer Loss of Gross Profit** means loss of **Customer Gross Profit** incurred by a direct customer of the **Insured**, and for which the **Insured** has a legal obligation to reimburse or pay that customer, and which is caused solely and directly by an **Insured Event**, for the period:

      i.    of twelve (12) months following discovery of the **Insured Event**, or

     ii.    the period during which the sales revenue of the **Insured's** direct customer remains less than the level that was or could have been reasonably projected had the **Insured Event** not occurred

whichever shall be the period first to expire.

B.    **Customer Gross Profit** means the difference between:

      i.    the revenue of the **Insured's** direct customer that was or could have been reasonably projected prior to an **Insured Event**, but which has been lost solely and directly as a result of an **Insured Event**, and

     ii.    the variable costs that would have been incurred, but which have been saved as a result of not making those sales (including the cost of raw materials and all other saved costs).

It is further understood and agreed that Exclusion 4.5 is deleted and replaced with:

4.5    injury, damage or claim made by a third party arising out of or in connection with the use or consumption of the **Insured Product(s)**, including defense costs related to a third

SL CPI – 001 (11/09)                                1

Copyright © C. V. Starr & Company and Starr Surplus Lines Insurance Company. All rights reserved.

## Starr Surplus Lines Insurance Company

Starr Surplus Lines Insurance Company
399 Park Avenue, 8th Floor
New York, New York 10022

party lawsuit. This exclusion does not apply to **Customer Loss of Gross Profit.**

It is also understood and agreed that the Company's maximum Limit of Insurance will not exceed the following by reason of any one **Insured event** and in the Aggregate:

USD$ 3,000,000 **Customer Loss of Gross Profit** each **Insured Event** and in the Aggregate

In addition it is understood and agreed that that the following is added to the Declaration:

Self Insured Retention:

Customer Loss of Gross Profit USD$   250,000 per Insured Event

It is a condition precedent to the Insurers liability under this policy that the **Insured** provides satisfactory documentary evidence which sets out in detail how the **Customer Loss of Gross Profit** has been calculated by the **Insured's** direct customer(s). The **Insured** shall produce any such documentary evidence which the Insurer or their representatives, including forensic accountants, may require, and the **Insured** shall afford them every assistance in their investigations including reasonable access to the **Insured**(s) premises, personnel and necessary correspondence between the **Insured** and their direct customer(s) for the purpose of the computation of loss.

Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of this policy except as set forth above.

All other terms, conditions and exclusions remain unchanged.

_Honora Leane_                    _CM Dough_

SL CP1 – 001 (11/09)                    2

Copyright © C. V. Starr & Company and Starr Surplus Lines Insurance Company. All rights reserved.



**Starr Surplus Lines Insurance Company**

Starr Surplus Lines Insurance Company
399 Park Avenue, 8th Floor
New York, New York 10022

[Honora Keane], General Counsel                    [Charles H. Dangelo], President

SL CPI – 001 (11/09)                    3

Copyright © C. V. Starr & Company and Starr Surplus Lines Insurance Company.  All rights reserved.

**Starr Surplus Lines Insurance Company**

Chicago, IL 1-646-227-6300

## Service of Suit Endorsement

**Policy Number:** SLSLCRM82025511 **Effective Date:** 11–15-11 at 12:01 A.M.
**Named Insured:** Tri-Union Seafood

This endorsement modifies the insurance coverage form(s) that have been purchased by you and evidenced as such on the Declarations page. Please read the endorsement and respective policy(ies) carefully.

As used in this Endorsement, the "Company" refers to Starr Surplus Lines Insurance Company.

This applies in California.

It is agreed that in the event of our failure to pay any amount claimed to be due hereunder, we, at your request will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this condition constitutes or should be understood to constitute a waiver of our rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon General Counsel, Legal Department, Starr Surplus Lines Insurance Company, 399 Park Avenue, New York, N.Y.10022 or his or her representative, and that in any suit instituted against us upon this contract, we will abide by the final decision of such court or of any appellate court in the event of any appeal.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefore, we hereby designate the Superintendent, Commissioner, or Director of Insurance, other officer specified for that purpose in the statute, or his or her successor or successors in office as our true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of you or any beneficiary hereunder arising out of this contract of insurance, and hereby designate the above named General Counsel as the person to whom the said officer is authorized to mail such process or a true copy thereof.

All other terms and conditions of this Policy remain unchanged.

Signed for the Company as of the Effective Date above:

_____
**Charles H. Dangelo, President**

_____
**Honora M. Keane, General Counsel**

Copyright © C. V. Starr & Company and Starr Surplus Lines Insurance Company. All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

 **Starr Surplus Lines Insurance Company**

## CRISIS PROCEDURES

In the event of an incident that may be covered under the terms of this policy, please contact **red24** at the **Crisis Center Hotline.** No prior written consent will be required from Starr Surplus Lines Insurance Company for the use of **red24**.

| red24 Crisis Center Hotline | |
|---|---|
| USA | +1 866 392 4204 |
| Outside of the USA | +44 200 500 0570 |

### What you need to know about red24

➢ **red24** can be reached via the telephone number listed above 24 hours a day, 7 days a week

➢ Once you have made telephone contact with **red24** and exchanged information about the situation, the team at **red24** will decide the best course of action for your unique situation and you will be contacted within the hour.

➢ If it **red24** personnel are dispatched on site, they will provide further guidance for handling the situation.

### What red24 needs to know

➢ Policy number

➢ Summary of the incident

➢ What type of consultant is being requested
  o Accidental Contamination
  o Malicious tampering
  o Governmental Recall
  o Producer Defect

➢ Contact name and information

➢ Alternative contact information

## CLAIMS NOTIFICATION PROCEDURES

Please note that notification to the Crisis Center Hotline is independent of and does not supersede policy requirements of notice to the Company.

In compliance with section 5.22 of the policy Notice of Loss, Starr Surplus Line Insurance Company must be notified in writing as soon as is practible.  Notice of loss may be addressed to the following:

**Starr Adjustment Services, Inc.**
**3353 Peachtree Road, NE, Suite 1000**
**Atlanta, GA 30326**

**Claims Fax:**    (404) 946-1497
**Claims Phone:**  (404) 946-1400